So we'll hear the first case, United States v. Rostholder. Mr. Robinson, when you're ready. Thank you, Your Honor. May it please the Court, Gerald Robinson for Relator Barry Rostholder. In this false claims act case, the District Court of Maryland dismissed this action because it held Relator's allegations did not satisfy the first prong of Harrison, requiring that the Relator allege either false statements or a fraudulent course of conduct. And so holding the District Court explicitly invited further guidance from this court and expedited that review by denying Relator's motion for leave to amend. The apparent reason for that invitation was to clarify whether an FCA action based on noncompliance that bears directly on the essential element of the government's bargain, here a bargain for drugs of known safety and efficacy requires additional signals from the government indicating that compliance is a condition of payment. Relator's position is that imposing such additional requirements would rewrite the FCA's scienter and materiality elements for such ordinary situations and be contrary to this court's admonitions in Berg and Harrison. In fact, it would yield the absurd result that an M-16 manufacturer could intentionally use cheaper, defective metal to make trigger mechanisms, leading to the death of soldiers in the field, yet there would be no false claims act liability because the government failed to explicitly say that compliance with the essential element of quality had any bearing on whether defendants should get paid. Defendants here recognize that distinction between regulations that bear on the essential elements and inconsequential regulations and consistently attempt to frame this case as the latter. For example, they interpret Medicaid and Medicare Part D's definition of covered outpatient drug as encompassing only pre-market approval of the drug's formulation and indications for use and as applying Excuse me for interrupting, but I think that's a good point because you're talking now about statutory authority. Do you have any statutory authority for the contention that drugs that are processed in violation of the good manufacturing procedures are not reimbursable? Do you have any authority? I do, Your Honor. Because I haven't seen that in your presentation. The authority for that, Your Honor, is the structure of the Okay, my question is do you have statutory authority for that proposition? There is not a sentence that outright says compliance with CGMPs are a condition of payment by Medicare and Medicaid. What Medicare and Medicaid did was apply the legal principle that one finds in Restatement Second Contract, Section 181, where if a good requires licensing and that licensing is intended to protect the public health, a demand for payment for that good is only enforceable if the good complies with those licensing requirements. Yeah, but that doesn't answer the question because these were approved and they were never disapproved, and there's nothing to say that reimbursement won't be allowed for disapproval. There are sanctions for what happened here, and the sanctions were threatened, I guess, and the company actually voluntarily complied. But the question, I think, goes to the heart of one of the problems the district court identified, which is that drugs that were sold or eventually were reimbursed to Medicare and Medicaid were subject to reimbursement. There's nothing to say they weren't. Your Honor, respectfully, Relater disagrees. Medicare and Medicaid's definition of covered outpatient drugs says that the drugs have to comply with 21 U.S.C. 355, and that provision is the FDA's avenue for permitting drugs into interstate commerce, and it has two parts. The part that everybody's familiar with, the pre-market approval, the scientific study for the safety and indications for use, and the second component, which gets implicated here, which is governing the manufacturing and processing of the drugs to ensure that what reaches the consumer is what was actually approved by the government. In that concept, manufacturing and processing, the regulations at 21 CFR, if you'll give me just a moment, 207.3 sub 8 expressly states that manufacturing and processing means repackaging. It covers everything. 355 covers everything from a concept. What's the second prong say? What's the language of the second prong that says Medicare won't reimburse? Give me the language. You said the first prong was it had to be approved. In order to get reimbursement, it had to be approved. What's the second prong say? Your Honor, I don't have that language. Isn't that the essential part? In other words, it has to say, to carry out your theory, that Medicare will not pay if it is not certified to be in accordance with good practices. But I must say, we didn't find anything that said that in our look also. See, Mr. Robinson, what worries me, to piggyback on to Judge Niemeyer's comment, is that what you're doing is asking us to read the fraud element out of the False Claims Act because you make an argument for materiality. And it seems to me that you just fail on the scienter aspect of pleading your case. How can you have fraud if you don't have a statute that says that these aren't reimbursable? The statute, Section 355, to answer Niemeyer's question and at the same time answer your Honor Keenan's question, the language in Section 355 says that the methods used in and the facilities and controls used for the manufacture, processing, and packing of the drugs must be adequate to preserve its identity, strength, quality, and purity, and that the labeling is not false or misleading. That language is then what the FDA used to promulgate the CGMPs and enforce that manufacturing and processing component of 355. You still have to say what was reimbursable. In other words, your whole case depends on a bunch of sequences, and one of the sequences is a submission by the nursing home to Medicare or Medicaid of a claim that's false, for which there is no reimbursement. And it looks to us, we couldn't find in our office, we couldn't find a statute that says these circumstances, the drug's not reimbursable. There are sanctions for violating all the good practices you're talking about. There are, your Honor, and as a housekeeping matter, the ancillary allegation about cost reports from nursing homes leading to damages under Medicare Part A was not well developed in the complaint. It was not the focus of the party's briefing here. Just to get on to that, there's another problem is that these were sold to nursing homes, and they were not earmarked for Medicare or Medicaid. It was up to the nursing homes and their own clients who submitted them, and not everyone, I'm sure, went to, or at least you can't allege that every person was going to be submitting to Medicare or Medicaid. Your Honor, the drugs were not. It seems to me if any one of them or a bunch of them were submitted for private reimbursement, it makes it a difficult case for you to argue this remote submission of a false claim by the nursing home. Your Honor, the nursing home piece of it, like I said, is ancillary. That's not the focus of our case. The focus of our case are prescriptions that were written for individuals, not drugs that were sold by batches to nursing homes for dispensing by the nursing home. Drugs where a prescription was written for nursing home residents, they're filled by Omnicare's pharmacies. Omnicare's pharmacy, up through 2005, most of the residents in nursing homes, their drug coverage was under Medicaid. And so the Omnicare pharmacies would submit those claims for reimbursement directly to Medicaid, get paid directly by Medicaid. In 2006, Medicare Part D- Who did Omnicare repack? Who did they sell the drugs to? Repack sold the drugs to Omnicare pharmacies. It was a vertically integrated company. Well, you're not asking us to break down corporate structure, are you? No. Okay. So your argument has to be that Omnicare caused the fraud to happen. Yes, sir. And they caused the fraud to happen, they have to have some notion that a particular drug will end up with Medicare or Medicaid. Indeed, they did. Their entire business model was premised on providing drugs to residents in nursing homes. I understand, but they don't all have to go to Medicare or Medicaid, do they? A vast majority of the drugs did. 54%? Is that what was the number? The conservative statement in the complaint was at least 50%. Yeah. But based on the authorities that are cited in the reply brief, that percentage is likely higher than 50%. Seventy percent of nursing home residents in this country are covered by Medicaid, so that suggests a higher percentage than 50%. In order to accept your theory of the case, wouldn't we have to find that there is a reasonable possibility of contamination simply because the good manufacturing practices were not observed? Ultimately, at trial, yes, that finding would have to be made. At the pleading stage, Relator submits that what needs to be pled is that there was a reasonable possibility of penicillin contamination. And based on his experience working there, he knew there was. When you made that legal argument, as I see it, it seems to me that it's more of an intuitive reliance that there's a reasonable possibility rather than a legal argument that you're making. So could you walk us through the legal argument that you're making that there is a reasonable possibility of contamination based on the violation of the good manufacturing practices? Because it seems to me that if you don't have that, you don't have your case in any respect. Your Honor, Relator was the supervisor of the repack. He knew the operations. He observed what was going on there. It was his job to know how the operations worked. There are three regulations at play. 21 CFR 211.42D, which says penicillin packaging operations must be separated and isolated. 211.46D says that isolation includes the ventilation system. That must be separate. And then the final regulation is 211.176 that says if there's a reasonable possibility, then the drugs must be tested before they go out the door. They must be tested. It doesn't say if there is a reasonable possibility based on exposure. It just says if there is a reasonable possibility. The reasonable possibility here arises, as Relator alleged, because there was no separation of repack from the commercial pharmacy that was in the same building. There was the same air handling system. We don't know that any of the drugs were contaminated, do we? Defendants... From the complaint. From the complaint, there's no allegation that there is proof of actual contamination. And I submit there probably never will be because defendants destroyed the drugs here. The FDA... What's critical here is that the FDA corroborated the Relator's assertion and conclusion that there is a reasonable possibility of contamination. They went in there in the summer of 2006, and what defendants omit from their brief when they discuss this warning letter, FDA went in there, and on July 27, 2006, they shut the place down. They quarantined the inventory, and they said there is a reasonable possibility of contamination. In fact, there's so much penicillin dust and contamination in the environment here, we won't let you reopen in this building, and we might not let you reuse that equipment either. Okay, that's regulatory compliance. That's regulatory... What is the false certification, though, that was made in this case? Your Honor, Relator's position is that false certification is not necessary. It's an additional add-on. It's an additional construct that's necessary when the regulations don't bear on the essential element of the bargain. Right, but didn't you in the... Now, I may be not remembering this correctly, but I thought in the trial court you said you were not relying on any implied certification theory. Didn't you specifically say that in the trial court? I distanced myself from the rigid concept of implied certification. I thought you specifically said that you were not relying on an implied certification theory. Didn't you tell Judge Blake that? I did say that, Your Honor, and I... So what's the false certification here, then? This Court has never endorsed the implied certification theory, and I don't believe it's necessary for it to do so because that construct smuggles in materiality and scienter into the first prong of falsity, and this Court has always kept those separate. Let's be sure. You won't make an implied certification claim, will you, to us? If this Court were to... No, no, you have to answer the question. Are you even making an implied certification claim on appeal to us? If it's defined the way the D.C. Court did in SAIC, it would be consistent with Relator's arguments here. But my position is that that's a meaningless label. I didn't ask you that. I didn't ask you that because I'm going to ask you beyond that. I get the second part of your argument is you think that implied certification is not required, basically. Isn't that what you think? Yes, sir. Right. But to the extent implied certification is or is not required, you're not making that claim to us, are you? Because didn't you... Haven't you waived that below and on appeal? You haven't raised that issue with us, have you? I think that's what Judge Schena was asking you. Did I read the record wrong? You did not waive the implied certification claim below? No. I don't believe there was an absolute waiver of the implied certification. Did you press it below? I did not press it below. No, because the... And you didn't because you don't think it's essential to your case? No, I don't, Your Honor. Okay. But... Because this case focuses on essential element of quality. No, I understand all that. I'm just kind of a little bit surprised that you won't be more clear on the implied certification. I thought that that is not in this case before us. And that's so because I thought you would say that is correct. Right. But you don't need it. No, I don't need it. I know you don't need it. That's the second part. But let's be clear for the record and take a look at Joint Appendix 133. Didn't you say this is not an implied certification case? We don't argue that it is. That was my statement to the Court, Your Honor. I don't disavow that statement. Take that off the table here, can't we then? As a practical matter, I think this Court has taken implied certification off the table a long time ago in Berg and in Harrison. But that's not the question. The question is what you said. Why are you struggling so much to say it's off the table based on the statement Judge Keenan just read to you? Why? Do you think it's so one to cut your argument you can't stick with that position? No, I don't think it is. So then why are you fighting that so much? I don't understand. I'm concerned about getting caught in a semantic catch-22. The whole concept of implied certification requires that the restrictive reading by the Second Circuit, requires that the statute or regulation itself, 211.176, would have to have a statement that the compliance is a condition of payment. I know that. Other courts don't. Just wait one second. But what were you thinking when you made that statement? I did not want a definition of implied certification that was the same as the Second Circuit, requiring that express condition of payment in the regulation. When I'm talking, I just think the way it's better if you'll stop talking until you listen to my question, and then you answer it. So then why didn't you say at that time, this is not an implied certification to the extent it's read this way? That's not what you said, is it? No, it's not. But in a later submission, in a post-argument submission, I clarified to the district court that that was my intention at the time. Nerves standing up before the court, Your Honor. It's hard to believe you can be nervous standing up in front of some judges, but I can't say that can happen. We've been there before. Yeah. We had 40 minutes to argue that day, and I was trying to sort out, well, what do I say and how do I say it? On hindsight, I told the court I just didn't want it to be that definition. But if, in fact, we take your word of what they say, and you say it's not an implied certification case, contrary to what we now see as an explanation, you think you still win. Yes, sir. Even with that statement. Well, let me just add to that a little bit. It looks to me like the district court did not consider an implied certification argument, which would seem to take it off the table. The court said, Fourth Circuit, however, has not yet adopted the implied certification doctrine, and Relater clarified an oral argument that he does not ask the court to do so. Indeed, Relater explained that this is not a false certification case at all, express or implied. That's what the district court said. Yes, and I was not asking the district court to write new law on the Fourth Circuit and adopt the or suggest adoption. If it's not been decided by us, the district court could have run the way some other circuits may have run. But you didn't ask her to do so. I'm just following up. It's important for us when we write these cases and decide them that we don't decide issues that weren't raised, or if we decide issues that you did raise them and are addressing them and making that case. And it looks to me like there's a whole new problem or different problem in deciding whether implied certification is in play here. And the district court never considered that. And you didn't press it. As a matter of fact, you told the court it shouldn't consider it. And it seems to me at this point we should decide, review the case that was decided. Isn't that right? I would agree so, Your Honor. And I think the implied certification is best resolved and addressed by this court in a different type of case where the regulation has no bearing on its face with the essential element of quality. What's the inherent falsity here beyond noncompliance? The inherent falsity is that presentment of a claim for a drug is necessarily a representation that it meets the basic quality elements, i.e., that it's permitted in interstate commerce through 21 U.S.C. Section 355. And to the extent the drug was not, then the presentment of the claim falsely represents that the drug is permitted in interstate commerce. Well, that sounds like noncompliance, though. It is a type of noncompliance, but that's where we have in the health care context. I know, but the question was, I think the question was, what other than noncompliance are you asserting? There's no other assertion, Your Honor. It is noncompliance with the definition of covered outpatient drug, which incorporates the CGMPs. And here we're focusing not on all CGMPs. I wouldn't make the argument that any technical violation of CGMP has some bearing on the essential. We have to choose and we have to rewrite the statute because Congress said when Medicare and Medicaid is authorized to be paid. And I could not find where noncompliance or an approved drug that was manufactured defectively shouldn't be reimbursed. Your Honor, that then takes the ultimate decision on this type of case would turn on the second and third prongs of Harrison. Whether the violation was material to the government's bargain for a drug of known safety and efficacy and whether defendant's misconduct was done with the requisite scienter. Here, that materiality is evident from the face of the regulation. But under your theory, you said it wouldn't cover a technical noncompliance. But under your theory, why wouldn't it cover a technical cover? As far as scienter and other questions, those other two steps, you still may have a question. But why wouldn't a technical noncompliance form the same basis for a claim that your claim noncompliance? Your Honor, it would indeed satisfy the first prong. There'd be some bearing on whether it's a false statement. I just thought you said, I thought you just said in your explanation, it wouldn't cover a technical noncompliance. I should have made a better word choice, Your Honor, and said that it ultimately would not have been actionable. Instead of saying it wouldn't have been covered, it would cover? That's the word choice you should have made? Because that's your claim, isn't it? On the noncompliance, any noncompliance at least lays the basis for a claim under your theory. Any noncompliance with CGMPs would render a claim for payment a false statement. Because the definition, the statutes, the CGMP regulations themselves say that any violation renders the drug adulterated. The definition of adulterated says if it's adulterated, it's prohibited from interstate commerce. So on its face, yes. All right. We've given you a little extra time there. Thank you, Your Honor. You still have a little rebuttal. Why don't we hear from Mr. Martin? May it please the Court, James Martin for the defendant, Colin Rablin, is with me at council table. In order to rule in relator's favor here, this court would have to abandon the significant constraints it has placed on false claims act, liability, and indeed abandon essential elements of the statutory scheme. Most particularly here, what we've heard is an argument that equates materiality with fraud and omits any position on the pleading of objective facts that show the fraudulent submission of a claim or fraudulent payment of a claim. And a regulatory violation alone, as this court has made clear, is not sufficient for false claims act liability. And when council summed up his argument at the end, that was his argument. A violation of the statute alone not only was material, but it was tantamount to fraud. That would be the most radical expansion of this statute that hasn't been adopted or accepted by any court anywhere. All the courts agree that mere regulatory violations are not enough. And unless that violation rises to the level of a precondition for the payment of a claim, you can't even begin to start a discussion about objective falsity or fraud. I would also add that... You think that the other side's theory actually removes materiality? Because as he just said, any violation is enough. It either removes materiality or it subsumes the fraud element into a materiality inquiry. In either way, that would be at odds with this court's... But I'm just saying, but as to materiality as to a technical violation, doesn't that make any violation? Doesn't that do away with materiality? Well, Your Honor... Under his theory? Yes, it does. And I would fence with the notion that he even has a case of materiality here based on what actually happened on the record in this case. First of all, as the court has noted, we have the absence of any statutory provision that gives any indication that the submission of these claims was in fact false, fraudulent, or wrong. Second, look at what the government did. It never made a claim for recoupment or payment based on this so-called benefit of the bargain on the theory that if this materiality element was in play, they most certainly would have and could have done it. But at the oral argument in this case, what did they say when asked if this prospect of contamination would equate with a False Claims Act liability? Is your argument that the other side loses because of the facts of the case or the pleading of the case? I think it is on the pleading now on 12B it loses, and if they proved in behind their complaint what they've alleged, they would lose as well. What, in your opinion, what one more incremental fact or the smallest number of incremental facts would change the facts to make it a claim? You understand my question? I do understand your question. You're saying it's not a claim under the facts as well as the pleadings. I'm just wondering, just for my edification, what more would have to be added to the facts? I'm looking for minimal changes. What more would have to be present here, in your opinion? Well, I would start with something. By the way, let me make it clear. I'm not asking you to say those facts were there or to say your client did anything wrong, but I'm just exploring your theory of what's required. Let's start with the basics of the first claim under the statute, the fraudulent submission or payment of a claim. Right. I think you would first have to have a statute, regulation, or contractual provision that actually created an objective fact that the defendant perceived that would show that the submission of these claims somehow violated the statute, regulation, or contractual provision. Some express or explicit statute or regulatory provision would have to be violated by the factual happenings by the person. Or there would have to be the presence of a specific contractual provision which would tell the defendant that the submission of this claim would be false or fraudulent. We don't have any of that. Second, you'd have to have objective facts showing a scienter and a fraudulent scheme designed to- What about that? I don't- The rest of the facts stay the same. What about that? I don't think that will do it, Your Honor, and it won't do it because there is no statute, regulation, or contractual provision that says the submission of adulterated drug for payment alone is a problem for the FDA or the CMS or anyone else, and it's not ineligible for payment. So if they purposefully adulterated the drugs, it's all hypothetical. Under the rest of the facts being the same, there would still be no claim. That a company purposefully adulterated the drugs and then put them in this same distribution chain, you say that still does not make a false claim? I don't believe it does, Your Honor, because what you would have is proof of a purposeful violation of a statute, and that's where it would stop. But there would be a criminal penalty. Oh, most definitely we're subject to regulatory violations, to sanctions. Perhaps those products could be seized. But the False Claims Act, if I haven't made it clear, I think this Court has, operates in a much narrower range. You can have a fraud on the government on the one hand and a payment on the other, but if you don't have that glue in between and the nexus where the fraud belongs, which this case doesn't have on its allegations, you can't get there. And you can play with the front end as much as you want, and you can play with the back end as much as you want, but the hole in this case remains. And the hole, Your Honor, is beyond the lack of a statute regulation or contractual provision. There are no allegations specifically of fraud that can be attributed to Omnicare from a scienter standpoint, those facts are absent, or from how this scheme conceivably was put in motion. If we look at the Nathan case on the 9B end of this, this would be the first case this Court had ever accepted for consideration. I understand your argument there, but my hypothetical, I was putting scienter and fraud on the front end, and I was looking to see what you think is necessary on the back end. And you think there would be no false claim, I understand there might be criminal prosecution for other matters, fraud, something else, not false claims, but what if there is known adulteration and it's put in a process by which there are, in fact, claims made to the government on those adulterated products? Your Honor, I still think you're coming up short, because as the Viruru case and other cases from this Court make clear, the fraud that the Act aims at has to be objectively pled with respect to the submission of the claims for payment. And so the fact that I knowingly have violated the CPMGs on the one hand, and the claims are submitted for payment on the other. But what if you know the claims are going to be made through that back end process on your adulterated products? There is still no statute, regulation, or contractual provision that says the submission of that claim for payment by the CMS is, in fact, a breach. That's where I say this case also on its facts fails. It sounds to me like you're making a distinction in connection with Judge Shedd's hypotheticals that there may be a tort, but the misrepresentation claim requires a pre-existing obligation that you submit a claim only. If it said you could not submit a claim for adulterated drugs, and you did so, then it's a false claim. I agree with that. And so what you're saying is the absence of the statutory structure does not suggest that's a false claim, but does treat it as a tort. And the more upfront scienter and mens rea you have, the worse the penalty is going to be. It's a criminal violation, and they may be able to seize drugs and impose penalties and close down the place. But with respect to making a false claim, they've never suggested in the statutory structure that that would be a false claim. That's right. It's not a precondition. Is that understanding your position? Yes. I'm not saying I agree. I'm just saying. I think that you would have to establish that it's a precondition for payment, Your Honor. Would that be aiding and abetting a false claim, my hypothetical? Well, I understand your answer. Let me say this. I understand that to be your answer on that scenario. I understand your argument about that, but I'm just sort of wondering, is there some situation in which the knowledge that you've adulterated, one's adulterated, the knowledge that one is putting that in a position that there will be claims made over it, I'm just wondering, it seems to me a bit hard to just say that's no different than when you don't adulterate, but it's still because of some repackaging. That's a different scenario than when you know it's adulteration and you know a claim is going to be made over those adulterated products. Now, maybe it still doesn't reach enough, but it does seem to me it's a different scenario. I agree it's a different case, Your Honor. And let me say two things. First, I think you could have a case where there's a violation of the CGMPs and you could end up with the submission of a false claim for payment. I am not arguing that that's not possible. For example, if the pharmaceutical here was supposed to be an 85-milligram dosage, and I know I am making 75 milligrams and that those are going to be submitted to the government for payment, we are starting along the track towards a false claim case. Stop. Let me go back and explore. How is it out of that scenario do you know they're going to be submitted? The way they were known here? In other words, some of the things you're doing, more than 50 percent, 54 percent, 50 percent, more than 50 percent as alleged, you know that some of those items are going to be pushed forward for reimbursement. Does that suffice? I said we'd be starting on the path, Your Honor, because in this case there aren't any allegations that make the link. But as the government said in the court below, if you had a product that was noncompliant with the dosage like that, they said that would be a situation where a false claim. And that arises because the reimbursement would be for 85 milligrams rather than 75 milligrams. And what statutory provision says the dosage has to be exactly the same? No, no, I'm just saying hypothetically if that's what the agreement with the Oh, the agreement, so you'd find that in the agreement. Yes, there you'd have objective facts where you could see that the submission of the claim conceivably could meet the requirements of the act. We don't have that here. All right, let me ask this and then I'm going to let you go on with your argument. What if the manufacturer knew that under Medicaid, Medicare requirements or whatever? I don't want to say that. What if they knew they were selling as 85 milligram drugs, 10 milligrams? They knew it and they knew that was going to get in the process and they sold directly to nursing homes or to patients in nursing homes. And those people then applied for reimbursement. Right. Does that make that a false claim? Not as far as you went, Your Honor. OK. We're still missing facts that relate to CENTER. We're still missing facts about. Well, the CENTER is they know they're doing 10 milligrams rather than 85. I think we're on the path there, Your Honor. What else do you need? I'm just asking. Right. You would need specific. So the manufacturer, I just want to make clear, the manufacturer knows that he's cheating on the amount of drugs he's putting in that capsule. He knows that in the process, it's going to be submitted. It's going to be a submission, not by him, but a submission by a client of his or a customer of his. There's going to be a submission as if it is done correctly, but it's not done correctly. But you say that would make out a claim? Well, no, I think you added some facts there that filled in the gap that I said was not in your prior hypothetical. You added some facts on the submission of the claim itself and the awareness of the manufacturer. Well, don't we have that in this case? No, we don't, Your Honor. We don't have a claim that the people in the nursing home would seek reimbursement. But that's all we have, Your Honor. We have an allegation of payment on the one hand and a statutory violation on the other and no bridge in between. Plus, we don't have a change in the dosage issue. I think the dosage issue doesn't go any further unless the dosage was misrepresented by labeling. In other words, the submission, how do they know what amount is in the capsule except how it's labeled? Because if they measured the weight, then there would be an intervening cause as to how much they seek reimbursement for. But if the repack said this package contains 85 milligrams and, in fact, it only contained 10 milligrams, now you have a representation. It's false. I just think we need more facts to make that work. They're not present in this record. There's no statute regulation or contractual provision that creates this issue of ineligibility. There is, in fact, no allegation of a specific representation. In fact, there's no evidence of any claim submissions at all. And so you have to climb too many hurdles on this record and abandon too many obstacles to recovery to make this case work. Well, I suspect that some of Judge Shedd's questions may have been focusing on whether we should give the plaintiff an opportunity to amend its claim and submit a claim that does comply. And you're saying, essentially, in this factual structure, there are no more facts that could comply. That's exactly right, Your Honor. It would be futile to allow an amendment here. If the plaintiff's theory is as far as he's gone in the district court and in the briefing here, you come up short not only under the lack of objective facts, but under Rule 9B, consistent with Nathan, and, in fact, because of the 10Ks, as we briefed, on the public disclosure element. There are three straightforward impediments to this claim, which can't be avoided by an amended complaint. Unless the Court has further questions. Thank you, Mr. Robinson. Real briefly, Your Honor, the essence of the appellee's position in this case is that, even when the essential element of quality is at issue, the burden is on CMS, Medicare and Medicaid, to go through all the FDA statutes and all the CGMPs and say, well, this one's material to payment and that one's material to payment. It's an unwieldy proposition. Except the problem is that the reimbursement provisions, the submission of a claim to Medicaid and Medicare, does not require there be a certification as to the quality. The drug is approved and it is submitted for reimbursement. Now, if it's deficient and it's contaminated, there are remedies. But in seeking the reimbursement, the argument from your colleague is that in seeking reimbursement, you are not saying to the government, this is of proper quality. The remedies that the FDA has to address this are prospective remedies, and as the Eighth Circuit said in the owning case and as I detailed in Note 6 in my reply brief, those remedies do not preclude a False Claims Act action. The FDA, in fact, does not have the ability to recoup funds that were paid by CMS. And even CMS, only the Office of the Inspector General has authority to use, with DOJ's approval, 13 U.S.C. 1320-878, which is mirror of the False Claims Act, to recoup funds that were improperly paid. And so it should not matter that inaction is brought by a relator or by the Inspector General of CMS. It does seem a little odd that quantity might allow for a False Claims Act claim, but the adulteration which effectively causes that diminished quantity, in other words, there's dirt instead of milligrams of drugs in that capsule that reduces from 85 to 15, that somehow that didn't cover as well, but if it falls on labeling, I guess it wouldn't. Your Honor, the Department of Justice has brought and settled two nine-figure cases on CGMPs against GSK and against Ranbaxy. Their statement of interest is that, yes, violation of CGMPs is actionable under the False Claims Act. And, in fact, both of those cases included allegations of failure to prevent penicillin cross-contamination. Now, there were a lot of other things going on in those cases. Other particulates and dirt and dirty water in the plants and a whole list of horribles. You know, it seems to me it's a different case. If you say the defendant manufactured aspirin and said this package basically contains 85 milligrams of aspirin and sells it as 85 milligrams of aspirin, it's making a representation that there are 85 milligrams of aspirin. And it turns out that it's nothing but flour and 10 milligrams. It seems to me there's a misrepresentation because you said you're selling 85 grams of aspirin, that's basically what you're certifying, so to speak, and that it's aspirin and not flour and 10 milligrams. But you never say when you sell 85 milligrams of aspirin that this is good quality aspirin or unadulterated aspirin or uncontaminated aspirin. And the statutes don't require you to. So their argument is until there's a statement, a misrepresentation on which the payment is made, either created by statute or regulation or by contract, which would be the representation in the packaging, then you can't have a false claim. You may have other things. You may have torts. You may have other things. But I would think that the hypothetical we have on the table about the quantity has to rise and fall on the notion that everybody in the stream of commerce is assuming that it has 85 milligrams, and the only way they're going to be able to determine that is the packaging. If the packaging says undetermined amount and then they sell it that way, we'd be right back where the quality issue is. There's no certification or representation, false representation being made. Right. And what would be required in that instance, Your Honor, would be a very long statement by every manufacturer. Except it's not required. We didn't violate all of these things. But it's not required. That's the point. That's their point. But why should it be required when the purpose of the regulatory scheme is to provide the assurance, and there's FDA enforcement case law in this circuit, COPANOS, cited in the brief. The purpose of the FD&CA is to provide that assurance that when you open up that bottle of aspirin, it's safe. Well, there are a lot of regulations that require this. I mean, we have civil penalties. We have criminal penalties. We have labeling violations. We have all kinds of things. But the question in this case is a narrow one. You have alleged that by submitting contaminated or possibly contaminated, we don't even know if they're contaminated, drugs to or for payment by Medicare or Medicaid, there is a false statement made. And that is the problem that we're wrestling with, and not these broader cases with other issues. And where was defendant's statement on each of those drugs that says, we didn't comply with the penicillin cross-contamination provisions, and, therefore, this drug contains a reasonable possibility that it's contaminated with penicillin. And, therefore, for those of you who are allergic, this is the equivalent of taking rat poison. That's misbranding, Your Honor. That's misbranding of the safety of a drug. Your example about the milligrams of aspirin is misbranding of the efficacy of a drug, the quantity of the drug. And we include in the complaint a reference to misbranding. We're not arguing about implied representations. We're talking about representations that are actually made in order to obtain payment. This is an allegedly defectively manufactured drug for which Medicare and Medicaid do provide reimbursement. And there's nothing in their statutes that they will not provide reimbursement for that. And that is the nub of the problem, I believe.  Your Honor, and I agree that this case essentially turns on whether this court agrees that when it comes to the essential elements of the bargain, price, quantity, and quality, presentment of a claim for payment is a representation that those essential elements have been delivered. Okay. I think we understand it. We'll come down. We understand your position. Thank you, Your Honor. We'll come down and greet counsel and proceed on with our next case.
judges: Paul V. Niemeyer, Dennis W. Shedd, Barbara Milano Keenan